IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | | |
|---|---|---|
| In Re: | ) | Civil Action No. 6:11-cv-00015 |
| KENNETH L. MITCHEM, | ) | |
| Debtor, | ) | |
| KENNETH L. MITCHEM, | ) | |
| Appellant, | ) | |
| v. | ) | |
| BRANCH BANKING AND TRUST COMPANY, | ) | |
| Appellee. | ) | |

| | | |
|---|---|---|
| In Re: | ) | Civil Action No. 6-11-cv-00016 |
| MEREDITH R. BUIST, | ) | |
| Debtor, | ) | |
| MEREDITH R. BUIST, | ) | |
| Appellant, | ) | **MEMORANDUM OPINION** |
| v. | ) | |
| BRANCH BANKING AND TRUST COMPANY, | ) | By: Hon. Glen E. Conrad<br>Chief United States District Judge |
| Appellee. | ) | |

Meredith R. Buist and Kenneth L. Mitchem (collectively, "appellants" or "debtors") filed a motion on August 26, 2010, in the United States Bankruptcy Court for the Western District of Virginia ("Bankruptcy Court"), seeking to avoid a lien held by Branch Banking and Trust

Company ("BB&T").[1]  On April 1, 2011, the Bankruptcy Court denied the appellants' motion, concluding that they could not avoid BB&T's lien.  As outlined in its order, the Bankruptcy Court based this conclusion on its factual finding that the debtors' property carried enough value to secure a first lien and also partially to secure BB&T's second lien.  On April 7, 2011, the appellants filed a timely notice of appeal pursuant to 28 U.S.C. § 158(a)(1).  The only issue before the court in the instant appeal is whether the Bankruptcy Court's factual finding regarding the value of the debtors' property is clearly erroneous.  For the reasons that follow, the court concludes that the Bankruptcy Court's factual finding is not clearly erroneous, and, accordingly, that the court must affirm the order.

## BACKGROUND

The debtors filed their joint Chapter 13 petition on August 9, 2010.  The debtors own real property, which they utilize as their residence, at 4404 Boonsboro Road, Lynchburg, Virginia 24503 ("property").  The property is subject to a first lien held by Countrywide Bank, FSB, which is secured by a promissory note and a first deed of trust in the amount of $208,000 ("Countrywide Note").  The debtors' property is also subject to a second lien held by BB&T, which is secured by a promissory note and a second deed of trust in the amount of $50,000 ("BB&T Note").

On August 26, 2010, the debtors initiated an adversary proceeding in their bankruptcy case, seeking a declaration from the Bankruptcy Court under 11 U.S.C. § 506(a) that the BB&T Note was unsecured.  Ultimately, the debtors sought under 11 U.S.C. § 506(d) to avoid the

---

[1] The court notes that this opinion represents a disposition in two separate appeals from the Bankruptcy Court, Mitchem v. Branch Banking & Trust Co., No. 6:11-cv-00015 (W.D. Va. filed June 14, 2011), and Buist v. Branch Banking & Trust Co., No. 6:11-cv-00016 (W.D. Va. filed June 14, 2011).  The appellants in these cases were joint Chapter 13 debtors in the bankruptcy action and, despite filing two separate appeals with this court, have proceeded with their cases before this court in a consolidated fashion.  For this reason, the court will also consolidate these two cases for purposes of this opinion.

2

second lien secured by the BB&T Note. Both the debtors and BB&T agree that, if the value of the property is equal to or less than the amount owed on the Countrywide Note, the BB&T lien may be avoided based on its wholly unsecured status. See In re Millard, 414 B.R. 73, 76–78 (D. Md. 2009) (concluding that a wholly unsecured lien is not protected under the anti-modification provision of 11 U.S.C. § 1322(b)(2) and, thus, may be avoided), aff'd, 404 F. App'x 804 (4th Cir. 2010). However, the parties disagree as to the value of the property—the debtors argue that the property is worth less than the amount owed on the Countrywide Note (and, thus, that BB&T's lien may be avoided), and BB&T contends that the property is worth more than the amount owed on the Countrywide Note (and, thus, that their lien may not be avoided). It was this very issue that the Bankruptcy Court confronted in a December 14, 2010 hearing.

At the hearing, both parties presented evidence to establish the value of the property. The debtors provided the testimony of Don Harvey ("Harvey"), an appraiser engaged by the debtors; William Coalson ("Coalson"), an appraiser hired by BB&T; Debra Douglas ("Douglas"), a realtor hired by the debtors; and Buist, one of the debtors. BB&T presented testimony from only Coalson. Each of the three valuation witnesses (Harvey, Coalson, and Douglas) agreed that the property required major renovations and that several of the rooms had been "gutted" and "taken back to the studs." (Docket No. 3-4 at 73, 96–97, 114.)

At the hearing, Harvey testified that the property's current unrenovated value was $197,500. (Id. at 74.) Harvey explained that he arrived at this figure by identifying what he considered to be comparable properties in the surrounding area that had sold within six months of his valuation. (Id. at 74–75.) One of these comparable properties ("Layman Road property") required renovations and "was in the same overall condition" as the debtors' property. (Id. at 75.) The Layman Road property sold in its unrenovated state for $190,000. Sometime later, it

3

was renovated and, at the time of Harvey's testimony, was offered for sale for $260,099. (Id. at 76.) Harvey also testified that his $197,500 valuation figure incorporated a subtracted amount of $50,000 for repairs. Harvey's $50,000 cost to cure figure constituted a lump sum amount that, except for several itemized cost estimates, did not list the specific repair amounts for individual renovations. (Id. at 81.) The few repairs for which Harvey offered an itemized estimate included, in pertinent part, the kitchen and a heat pump. According to Harvey, a renovated home in the price range of the debtors' property would call for a "nice wood kitchen" with cherry cabinets, stainless steel appliances, and granite countertops. Harvey testified that such a kitchen would cost between $15,000 and $20,000. (Id. at 79–80.) Harvey opined that replacing the heat pump would cost an additional $5,000. (Id. at 86–87, 151.) Upon completion of the necessary repairs, Harvey estimated that the debtors' property could "easily" be offered for sale for around $260,000 to $275,000. (Id. at 76.)

Douglas appraised the current value of the debtors' property at $199,500. (Id. at 100.) Like Harvey, her figure incorporated a subtracted amount of $50,000 for repairs. (Id.) Douglas' $50,000 cost to cure figure comprised a lump sum amount and included no itemized estimates for individual repairs. In a fully renovated state, Douglas testified that she would list the debtors' property at $249,900. (Id. at 101.)

Coalson testified that the current unrenovated value of the debtors' property was $260,000. (Id. at 116.) Incorporated into Coalson's valuation figure was a cost to cure amount of $27,000. (Id. at 118.) Unlike Harvey and Douglas, however, Coalson provided a cost to cure figure that included an itemized list of all necessary repairs and their accompanying costs. Relevant to this appeal, Coalson's cost to cure figure did not mention the heat pump and

4

recommended the installation of an $8,000 kitchen with formica countertops and "Lowe's-style" cabinets. (Id. at 119–20, 137.)

Finally, Buist mentioned in her testimony that the kitchen already featured a refrigerator, an oven, and a sink.[2] (Id. at 107.) Furthermore, Buist commented on Coalson's alleged aloofness during his inspection of the property and his unwillingness to heed input offered by her during the course of the inspection. (Id. at 108–10.)

The Bankruptcy Court issued its decision and order on April 1, 2011. Initially, the Bankruptcy Court reviewed the varying appraisals submitted by the three valuation witnesses and then observed, "While rationalizing competing valuations is not an easy endeavor, the Court notes that the facts presented by this case make determining the appropriate value particularly difficult." (Id. at 166.) The Bankruptcy Court further noted the "near impossib[ility]" of locating properties, for purposes of comparability, that are in a similar state of disrepair. (Id. at 167.) However, the Bankruptcy Court identified a common vein running through each of the three valuator's assessments—all three of these witnesses, according to the Bankruptcy Court, reached their individual appraisal values by first estimating the property's value if renovated and, then, by subtracting from that figure the cost to accomplish the necessary repairs. (Id.) The Bankruptcy Court elected to adopt this same approach in arriving at its own factual finding with respect to the property's current value.

In proceeding with this formula, the Bankruptcy Court first calculated a cost to cure figure. It found Harvey's testimony more credible with respect to the kitchen repairs; however, it reduced Harvey's estimate by $2,000 to $3,000 based on the preexisting presence of

---

[2] It was the presence of these appliances in the kitchen that prompted Coalson to omit estimates for these items in his cost to repair figure. (Docket No. 3-4 at 119.)

5

appliances.³ (Id. at 168.) Hence, the Bankruptcy Court allocated a range of $12,000 to $18,000 to the repair costs associated with the kitchen. However, for all of the remaining renovations and repairs, the Bankruptcy Court adopted Coalson's itemized list of repair items, which amounted to a total of $19,250, noting that, unlike Harvey and Douglas, Coalson "provided uncontroverted values for what it would cost to finish the remaining repair items." (Id.) The Bankruptcy Court then aggregated the curing costs ($12,000 to $18,000 plus $19,250) to arrive at a total cost to cure range of $31,250 to $37,250. (Id. at 169.) The Bankruptcy Court selected Douglas' $249,900 figure regarding the property's value in a renovated state and then subtracted the repair costs from that figure. (Id.) Thus, the Bankruptcy Court found that the approximate current value of the property was between $212,650 to $218,650. (Id.) Therefore, because the Bankruptcy Court found that there was an equity cushion of between $4,650 to $10,650, it determined that the BB&T Note remained partially secured. For this reason, the Bankruptcy Court concluded that the debtors could not avoid BB&T's lien.

The debtors then filed a timely notice of appeal. Both parties subsequently submitted appeal briefs and the court then heard oral argument.

## DISCUSSION

### I. Legal Standard

The court possesses appellate jurisdiction over this matter pursuant to 28 U.S.C. § 158(a). A district court reviews a bankruptcy court's factual findings for clear error and its legal conclusions de novo. In re Meredith, 527 F.3d 372, 375 (4th Cir. 2008) (citing In re Kielisch, 258 F.3d 315, 319 (4th Cir. 2001)); In re White, 487 F.3d 199, 204 (4th Cir. 2007). A factual finding is clearly erroneous if "the reviewing court on the entire evidence is left with the definite

---

³ Harvey estimated that kitchen appliances would cost between $2,000 and $3,000. (Docket No. 3-4 at 86, 168.)

6

and firm conviction that a mistake has been committed." United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948). If "there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 574 (1985) (citing United States v. Yellow Cab Co., 338 U.S. 338, 342 (1949)). When reviewing findings of fact, "due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of witnesses." Fed. R. Bankr. P. 8013.

## II. Analysis

In general, the appellants raise three arguments on appeal, namely, that the Bankruptcy Court clearly erred by (1) misinterpreting certain evidence and, furthermore, focusing on the wrong evidence in reaching its valuation figure, (2) calculating incorrectly the cost to cure amount, and (3) affording credibility to the valuation testimony of Coalson. The court will address each of these arguments below.

### A. Bankruptcy Court misinterpreted evidence and focused on wrong evidence

Initially, the appellants argue essentially that the Bankruptcy Court misinterpreted certain evidence and, furthermore, focused on the wrong evidence in arriving at its valuation figure for the property. First, the appellants criticize the Bankruptcy Court's statement that it was nearly "impossible" to locate "properties in a similar geographic region that are similar in size and in a similar state of disrepair" to the debtors' property (Docket No. 3-4 at 167), contending that Harvey testified that he found a property in a comparable state of disrepair—the Layman Road property. (Id. at 75–76.) The appellants' objection to this factual finding by the Bankruptcy Court proves unavailing, as the court is not left with the definite conviction that the Bankruptcy Court committed a mistake in reaching this finding. Even Harvey acknowledged that there were noticeable differences between the Layman Road property and the debtors' property. (Id.)

7

Furthermore, the court notes the drastic state of disrepair that characterized the debtors' property. (Id. at 73, 96–97, 114.) While the Bankruptcy Court might have been justified in focusing on the Layman Road property, the court recognizes that, if "there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson, 470 U.S. at 574 (citation omitted).

Second, the appellants contend that the value of their property would have been more accurately determined if the Bankruptcy Court had focused on the testimony regarding fair market value, rather than the speculative testimony concerning future listing prices that contemplated the completion of the necessary renovations. In the same vein, the appellants argue that, essentially, the Bankruptcy Court misconstrued certain testimony and employed a valuation formula that, contrary to the Bankruptcy Court's belief, was not employed by all three of the valuation witnesses. These arguments likewise fail. As the Bankruptcy Court noted in its order, the singular character of the property and the absence of comparable properties "make determining the appropriate value particularly difficult." (Docket No. 3-4 at 166.) In the exercise of its discretion, the Bankruptcy Court adopted the valuation formula that it considered most suitable to the unique situation before it. That the appellants, or this court for that matter, might disagree with the Bankruptcy Court's valuation formula is not enough to clear the high hurdle established under the clear error standard.

**B. Bankruptcy Court incorrectly calculated cost to cure amount**

Next, the appellants challenge the Bankruptcy Court's calculation of the costs associated with repairing the property. First, they argue that the Bankruptcy Court clearly erred when it assigned a range of $12,000 to $18,000 to Harvey's estimated cost to cure the kitchen. This argument likewise finds no traction. Although Harvey's testimony concerning the kitchen

repairs could be interpreted as supporting a high-end finding of $18,000, the court notes that his testimony could also be interpreted as supporting a range-based finding—Harvey testified that the kitchen repairs could "be 15, 20 thousand dollars." (Id. at 80.) In any event, this argument proves irrelevant. Even giving the debtors the benefit of subtracting the higher figure from the property's value, the property is still worth more, according to the Bankruptcy Court's findings, than the amount owed on the Countrywide Note.

Second, the appellants contest the Bankruptcy Court's decision to ignore testimony from both Harvey and Douglas regarding needed repairs to the heat pump. (Id. at 86–87, 99, 151.) After accepting Harvey's cost to cure estimate regarding the kitchen, the Bankruptcy Court adopted Coalson's repair estimates on all of the remaining items; however, Coalson's cost to cure figure made no allowance for the heat pump about which Harvey and Douglas testified. While the court notes that the Bankruptcy Court's decision to exclude the cost of repairing the heat pump exerted a dispositive impact on the outcome of this case,[4] the court concomitantly recognizes that the Bankruptcy Court elected to adopt Coalson's estimates regarding the cost to repair the non-kitchen items. The Bankruptcy Court based its decision on the fact that Coalson, unlike Harvey and Douglas, "provided uncontroverted values for what it would cost to finish the remaining repair items." (Id. at 168.) As discussed below, this credibility determination must be afforded due regard by this court. Fed. R. Bankr. P. 8013.

---

[4] Harvey estimated that the cost to repair the heat pump would run about $5,000. (Docket No. 3-4 at 86–87.) Adding this $5,000 figure to the remaining repair estimates, while using the high-end $18,000 figure for the kitchen repairs, would reduce the value of the property to $207,650—slightly less than the $208,000 value of the Countrywide Note. This finding would result in the determination that the debtors could have avoided BB&T's claim, which, under this reasoning, would be rendered wholly unsecured.

9

### C. Bankruptcy Court improperly lent credibility to Coalson's testimony

Finally, the appellants urge this court to conclude that the Bankruptcy Court clearly erred when it dismissed as incredible Coalson's estimates regarding the cost to cure the kitchen, but then proceeded to adopt Coalson's estimates regarding the cost to effect the non-kitchen repairs. The appellants argue:

> A reasonable man could not take the estimates of Mr. Coalson seriously when this appraiser believes that formica countertops and Lowes style cabinets would be in line with a house of this nature. Mr. Coalson's approach from his analysis of the kitchen and its requirements, clearly show that his idea of slap it back together the cheapest way possible is the approach that he took toward the costs obtained on this house.

(Docket No. 13 at 8–9.)

While the Bankruptcy Court might reasonably have determined to reject all of Coalson's testimony, the fact that it chose not to do so does not amount to clear error. The court notes that, especially regarding factual findings on witness credibility, "due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of witnesses." Fed. R. Bankr. P. 8013. It simply was not unreasonable for the Bankruptcy Court to conclude that the house could be rendered marketable with less than top of the line materials. As explained above, the mere fact that the appellants, or this court for that matter, might disagree is simply not sufficient to impugn the Bankruptcy Court's credibility determinations.

### CONCLUSION

For the foregoing reasons, the court concludes that the Bankruptcy Court did not commit reversible clear error in its factual finding concerning the value of the debtors' property. Accordingly, the Bankruptcy Court's decision and order that the BB&T Note is partially secured

and, thus, that the debtors may not avoid BB&T's claim, must be affirmed.

The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This 1st day of DECEMBER, 2011.

/s/ Glen Conrad
Chief United States District Judge